UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiffs,

v.

CHARLES HOLLOWAY and HIAWATHA ARLISS,

    Defendants.

                                /

Case No. 05-80659

Honorable Nancy G. Edmunds

**ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS EVIDENCE**

Pending before this Court are Defendant Charles Holloway's Motion to Suppress Evidence, filed on July 28, 2006, and Defendant Hiawatha Arliss's (sic)[1] Motion to Join and Motion to Suppress Evidence, filed on July 31, 2006. Defendant Holloway and Defendant Arlee (collectively "Defendants") are charged with possession with intent to distribute heroin. Defendants argue that evidence secured as a result of a March 5, 2005 traffic stop, including heroin, a taped discussion between Defendants, and Defendants' oral and written post-arrest statements, was tainted by an unlawful search and seizure and should be suppressed. Specifically, Defendants assert that (i) the officers' reasons for making the traffic stop were pretextual, (ii) the officers did not have probable cause to arrest Defendants because informant testimony was not reliable and no judicial authorization was received to install a GPS device in the car Defendants

---

[1]Although the indictment reflects Defendant's name as Hiawatha Arlee Arliss, his correct name is Hiawatha Arvis Arlee.

1

rented, (iii) Defendant Arlee did not consent to a search of the entire car, and (iv) recording Defendants' conversations in the back of the officer's patrol car violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968 .  The government responds that the search was lawful because (i) Defendants were speeding at the time of the traffic stop, making this a valid *Terry* stop search, (ii) the officers had sufficient probable cause to arrest Defendants, and (iii) Defendant Arlee consented to the search of the vehicle.

**I.  FACTS**

On February 22, 2005, DEA Special Agent Ian Ponman and Michigan State Police ("MSP") Trooper Craig Tuer interviewed informant Marion Redd regarding Defendant Holloway.  (Gov't's Resp. at 1; Arlee Reply at 2.)  Redd indicated that Holloway travels from Detroit to Brooklyn, New York once or twice a week to purchase heroin and described locations he had seen in Holloway's home where the heroin was stored before it was given to others to sell.  (Gov't's Resp. at 1, 2.)  Defendant Arlee was reputed to be Holloway's driver on these trips.  (Gov't's Resp. at 2.)  Redd's statements included the fact that Holloway uses Hertz rental cars when he drives to New York, along with additional details about Holloway's residence, personal vehicles and phone numbers that were confirmed by further investigation.  (*Id.*)  Specifically, a search of Hertz company records disclosed that Holloway rented a car from that company at least 15 times between March 2004 and February 2005.  Searches of other car rental companies disclosed additional Holloway rentals with them as well.  (*Id.*)  Most of the records showed mileage consistent with a trip from Detroit to New York City.

Based upon further information from Redd that Holloway was planning a trip to

New York on March 5, 2005, investigators installed a GPS tracking device in the car that Holloway rented from Hertz. (*Id.*) The GPS unit tracked the car from Detroit to Brooklyn, where it stopped for an hour and a half before returning to Detroit. (*Id.*) Following the GPS signals, Tuer stopped the vehicle on I-75 near Springwells in Detroit for speeding and weaving between lanes. (Gov't's Resp. at 2-3; Holloway's Mot. at 2.) Tuer ordered Defendants out of the vehicle and began a search for narcotics using a police drug dog after receiving Arlee's consent to search the vehicle. (Gov't's Resp. at 3.) The search for the heroin initially focused on the trunk, but included the car's interior and underneath the hood. An in-dash camera recorded approximately 24 minutes of video, starting with the initial stop, but the tape ran out before officers actually found heroin in the vehicle's air filter compartment. (Holloway's Mot. at 4.) During the search, but without being arrested, troopers placed Defendants in the back of the squad car, where the video camera recorded a conversation between Defendants. (Gov't's Resp. at 3; Holloway's Mot. at 3.) At no time during the video did the police dog alert to the vehicle. (Holloway's Mot. at 4.)

## II.  STANDARD OF REVIEW - MOTION TO SUPPRESS EVIDENCE

On the issue of whether the search or seizure was reasonable, the government has the burden of proof if the search or seizure was not conducted pursuant to a warrant. *U.S. v. Carhee*, 27 F.3d 1493 (10th Cir. 1994). *See, e.g., U.S. v. Cooks*, 493 F.2d 668 (7th Cir. 1974) (government has burden of proof to show that item seized was in plain view).

## III.  ANALYSIS

3

**A. Standing**

Although this issue was not raised by the parties, this Court must "examine the standing of [Defendants], as a matter of the case-or-controversy requirement associated with Article III." *Juidice v. Vail*, 430 U.S. 327, 331-32 (1977). As the person who leased the vehicle in question, Holloway has a property right in the vehicle that would lead to a reasonable expectation of privacy sufficient to assert standing on these facts. Arlee's position as an unauthorized driver[2] whose name did not appear on the rental agreement is not as clear, however. In *U.S. v. Smith*, 263 F.3d 571 (6th Cir. 2001), a case similar to the one at bar, the Sixth Circuit held that an unauthorized driver of a rental vehicle did have standing to challenge a search and seizure. The court stated:

> We acknowledge that as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest the legality of a search of the vehicle. However, we refuse to adopt a bright line test, as the government seems to advocate, based solely on whether the driver of a rental vehicle is listed on the rental agreement as an authorized driver.

*Id.* at 586.

In *Smith*, the court noted that the defendant was a licensed driver who was able to produce the rental agreement when asked, he was given permission to drive the vehicle by his wife, who was listed as an authorized driver, and he was the individual who had actually reserved the rental car that was picked up by his wife using the original confirmation number. *Id.* The court placed special emphasis on the defendant's "intimate relationship" with his wife, in holding that the defendant had standing under such circumstances. *Id.* at 587.

---

[2]Essentially, a driver that was not listed as an authorized driver on the vehicle's rental agreement.

Here, the government does not dispute that Arlee had a valid driver's license and showed the appropriate lease paperwork for the vehicle when Tuer stopped Defendants. As in *Smith*, Arlee's name did not appear as an authorized driver, however, and he does not share the close relationship with Holloway that the defendant and his wife did in *Smith*. Still, Arlee was in the car with Holloway at the time of the search and seizure, and the government does not dispute that Holloway gave Arlee permission to drive the vehicle. With these facts, this Court finds that there was a close enough connection between Arlee and Holloway to overcome the lack of a spousal relationship here. Therefore, Arlee has standing to challenge the search and seizure at issue even though he was an unauthorized driver of the vehicle.

**B. Tuer had Probable Cause for the Initial Traffic Stop**

A police officer's subjective reasoning for conducting a traffic stop is irrelevant when determining the reasonableness of a search and seizure incident to the subject stop under the Fourth Amendment. *Whren v. U.S.*, 517 U.S. 806, 813 (1996); *see also Arkansas v. Sullivan*, 532 U.S. 769, 771 (2001). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Defendants argue that Tuer did not have probable cause in this situation because (i) their "vehicle was *not* proceeding at an excessive rate of speed, but was following and proceeding at a rate equivalent to the normal rate of traffic," (emphasis in original) and (ii) the vehicle only weaved to the right in order to "avoid and move out of the way of the suddenly oncoming police vehicle traveling at a high rate of speed and tailgating Defendants'

vehicle." (Holloway's Mot. at 6-7.)[3]

Without even raising the issue of the swerve and whether the officers improperly caused this potential traffic violation, Defendants' argument regarding speeding fails of its own words. Defendants do not challenge the government's assertion that Defendants were traveling at least 77 miles per hour in a 65 mile per hour zone. It is true that the government has not put forth evidence of Defendants' speed by way of a radar gun or pacing of Defendants' car, but by failing to dispute the police officer's statement of how fast the car was traveling, Defendants' relieve the government of any burden on this point at this stage of the proceedings. All that Defendants' argue is that they were merely moving at the speed of other traffic in the area. Regardless of the speed of surrounding vehicles, police have the ability to pull over a car going 12 miles per hour over the speed limit. Therefore, Tuer had probable cause to make a traffic stop in this situation, so the initial stop was legal.

Defendants make several additional arguments that do not affect the resolution of this issue. First, they cite *U.S. v. Huguenin*, 154 F.3d 547 (6th Cir. 1998) to illustrate a situation where a search was invalidated because officers did not have probable cause for the initial traffic stop. That case involved a vehicle checkpoint stop where officers

---

[3]Defendants also claim that the traffic stop videotape recorded an MSP officer saying that Defendants were not pulled over for speeding (Holloway's Mot. at 7.) and note the fact that Arlee was never cited for speeding in an attempt to demonstrate that speeding was merely used as pretext in order to make the traffic stop. Defendants' briefs provide no information to support their claims regarding the officer's statement, despite the fact that Holloway's Brief includes a two-page summary of events recorded on the tape. Furthermore, the fact that a driver does not receive a citation for violating a traffic law has little bearing on whether the driver actually committed the alleged violation that led to the initial traffic stop.

had no probable cause for stopping the vehicle in the first place, however, so its reasoning does not apply here. Secondly, Defendants argue that the MSP officers had no reason to order them out of the car, given that there was no issue with Arlee's driver's license and the rental papers for the vehicle. The Supreme Court has held on at least two occasions that officers may order the driver and passengers out of a vehicle for a mere traffic violation without suspicion of any other criminal activity, so Defendants' argument on this point is misplaced. *Maryland v. Wilson*, 519 U.S. 408 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106 (1977).

### C. The Search After the Initial Traffic Stop was Proper

Even though a valid traffic stop allows police officers to search potential suspects and their vehicle, "[o]nce the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened *during the stop* to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [is] afoot.'" *U.S. v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (citing *U.S. v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000)) (emphasis in original).[4] A two-part analysis applies when courts assess the legality of a post-stop search: (i) were the officers involved "aware of specific and articulable facts which gave rise to reasonable suspicion . . . [under] the totality of the circumstances, and (ii) was

---

[4]As noted below in the discussion of the *Davis* case, the information the officers held concerned conduct that was more innocent and less specific than that which Tuer knew in this situation. As a result, it was imperative for the officers in *Davis* to find something during the traffic stop to confirm their suspicion of criminal activity in order to continue a search and seizure. Whereas, in the case at bar, the confirmed statements from the informant made it less important that MSP officers actually find further evidence during the initial traffic stop.

the "degree of intrusion . . . reasonably related in scope to the situation at hand . . . given their suspicions and the surrounding circumstances?" *Davis*, 430 F.3d at 354.

### 1. Tuer had Reasonable Suspicion to Support a Valid *Terry* Stop Search of Defendants' Vehicle

"Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *U.S. v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). (citing *Terry v. Ohio*, 391 U.S. 1 (1968)).

The government contends that Tuer had sufficient information from the informant and ongoing investigation to satisfy the reasonable suspicion requirement for the first part of the test. Specifically, an informant had provided information that Arlee frequently drove Holloway to New York in a rental car to purchase heroin, Hertz and other car companies had records of numerous rentals to Holloway over the past year, and the cars returned with mileage consistent with that for a trip from Detroit to New York. Furthermore, the GPS tracking device that MSP officers placed on the car Holloway rented tracked the car to New York where it stopped for a period before returning to Detroit, thereby providing support for the informant's statements about Holloway's alleged activities. Upon stopping Defendants, Tuer also noticed a discrepancy between the mileage listed on the rental agreement and that of the car, in that the odometer did not support the Defendants' story that they were heading to Chicago or Ohio.

Defendants cite several similar cases in arguing that this information was insufficient for the officers to form a reasonable suspicion to support the search in this case.

In *Davis*, the defendant was seen talking with a suspected drug dealer named Presley who was under investigation for operating a drug ring between Chicago and Detroit. Investigators noticed that the defendant's car had Michigan licence plates and there were two large boxes of detergent sitting next to the defendant's car. In an earlier search of a building linked to Presley, officers had found large detergent boxes similar to those present at the meeting with the defendant. Furthermore, investigators had previously found large amounts of cocaine in the vehicles of several other individuals who were stopped following past meetings with Presley. *Id.* at 349-50. In view of these circumstances, the Sixth Circuit held that Indiana State Troopers who pulled Davis over for speeding on I-94 acted legally when they detained him for 45 minutes while a police drug dog could be brought to the scene in order to sniff the defendant's car for the presence of cocaine because they had probable cause to do so. Once this initial dog failed to alert to the presence of any drugs, however, it was a violation of the defendant's Fourth Amendment rights to make him wait an additional 50 minutes for a second dog to be summoned. *Id.* at 355-56.

In *U.S. v. Sharpe*, 470 U.S. 675 (1985), the Court held that a 20 minute detention period following a traffic stop to wait for a DEA agent to arrive on the scene and investigate was legal. There, the agent observed the defendant's pickup truck in an area that was known for drug trafficking, the vehicle was heavily weighed down in the rear, and the truck's camper shell had been covered by some type of quilted material. Once the vehicle had been stopped by the South Carolina Highway Patrol and the DEA agent arrived, the agent also detected the smell of marijuana coming from the rear of the truck. *Id.* at 677-78. The Court noted that time is an important consideration, but it

9

is important "to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* at 685.

In *U.S. v. Smith*, 263 F.3d 571 (6th Cir. 2001), a Tennessee drug task force officer stopped the defendants' vehicle for swerving in and out of its lane. Upon making the stop, the officer noticed that the defendants were driving a rental vehicle, the passenger appeared "'stoned' and had a white mucus substance around his lips," there was a large number of food wrappers and soft drink cans thrown around the vehicle, a cooler on the back seat, and the defendants smelled as though they had not bathed in several days. Furthermore, the driver had the rental agreement ready to hand to the officer as he first approached the vehicle, and the officer did not completely believe the defendants' story that they were returning from Arkansas. *Id.* at 575. On these facts, the Sixth Circuit held that the officer did not have reasonable suspicion to validate a subsequent search by a police drug dog that uncovered illegal drugs in a bag within the car because the items observed did not necessarily lead to an inference of criminal activity. *Id.* at 594.

Although Tuer and the other investigators in this case did not have as many direct observations of illegal activity as the officers in *Sharpe*, they had more than that present in *Smith* and a comparable amount to what existed in *Davis*. The informant testimony corroborated by the rental car records and tracking data of Defendants' trip to New York was sufficient to support a reasonable suspicion of illegal activity, so the officers' search of Defendants' car was legal.

### 2. The Scope of the Search was Reasonably Related to the Circumstances of the Situation

"While a *Terry* stop may be constitutionally permissible initially, it may become an

10

impermissible 'seizure if it occurs over an unreasonable period of time or under unreasonable circumstances.'" *Davis*, 430 F.3d at 354 (citing *U.S. v. Orsolini*, 300 F.3d 724, 729-30 (6th Cir. 2002)). Defendants acknowledge that there is no per se rule on how long suspects are forced to wait for a search to be conducted before their Fourth Amendment rights are violated, *Sharpe*, 470 U.S. at 686, but argue that the length of the search in this case exceeded reasonable bounds under the circumstances, especially when the MSP canine did not alert to drugs in the trunk of the vehicle when the vehicle search began.

In the *Davis* and *Sharpe* cases cited above, the courts seemed to be concerned with the amount of time that suspects had to wait for a search to begin. Here, however, the MSP drug dog was on the scene within seven minutes of the traffic stop – not an unreasonable time. Although the full length of the resulting search is not known due to the end of the in-dash video tape, this Court is not convinced that a search which may have ended in as little as 17 minutes is unreasonable under the circumstances. This case is not like *Davis*, where the officer's reasonable suspicion of drugs being located in the car depended, in large part, upon the dog alerting to the presence of cocaine. Police in that case only had circumstantial evidence that the defendant might be transporting large amounts of cocaine based on a history of arresting individuals that had met with Presley on prior occasions. Here, however, Tuer had the prior informant testimony about Holloway's trips to New York along with the tracking information that confirmed the informant's statements. He also had the inconsistency between the car's mileage and the Defendants' stated destinations discovered during the traffic stop. The canine sniff here was not as important as it was in *Davis*, so it was not unreasonable for

11

the officers to continue searching Defendants' vehicle even after the dog failed to alert to any drugs in the trunk area.

Defendant Arlee's Reply Brief cites several additional cases that dealt with the length of time it took officers to bring a canine unit to the scene of a traffic stop in an attempt to argue that the length of time here was unreasonable. *See Illinois v. Caballes*, 543 U.S. 405 (2005); and *People v. Cox*, 782 N.E. 2d 275 (Ill. 2002). Both of these cases are inapposite to the issue in the case at bar, however, as they involved a "seizure that [was] justified solely by the interest in issuing a warning ticket to the driver . . . ." *Caballes*, 543 U.S. at 407. The length of time that would be appropriate in such a circumstance would be less than that which would be legal in this case, where police officers had reasonable suspicion of criminal activity beyond a mere traffic violation. As such, *Caballes* and *Cox* are not analogous here.[5]

### D. Probable Cause to Arrest Defendants and Search Defendants' Vehicle

The government also argues that probable cause existed for MSP officers to search Defendants' vehicle incident to a valid arrest without a warrant. Since the Court has already determined that the instant search was valid pursuant to a *Terry* stop, there is no need to consider the government's alternative arguments on grounds that probable cause existed to arrest Defendants.

### E. GPS Tracking Device

---

[5] Similarly, Defendant's cite to *U.S. v. Bailey*, 302 F.3d 652 (6th Cir. 2002) is inapplicable, as that case found that a two minute delay for a drug dog to be brought in was permissible in light of the officer's reasonable suspicion of criminal activity that was based upon the suspect's actions beyond a traffic violation. Nothing in *Bailey* indicates that the dog must be brought so quickly, however, and Defendant Arlee does not make this argument.

Defendants claim that judicial authorization is required to install a GPS device in a vehicle, and that once the corroborating information from this device regarding Defendants' trip to New York is eliminated, Tuer no longer had probable cause to arrest Defendants at the time of the traffic stop. Even Defendants readily admit that they "found no case that directly considered the issue," (Arlee Reply at 3.) and this Court does not agree with Defendants' assertion that its cited cases "suggest that judicial authorization is necessary for employing a GPS tracking device. (*Id.*) *See U.S. v. Wilson*, No. 05-1275, 2006 WL 1618148 (10th Cir. June 13, 2006); *U.S. v. Perez*, 440 F.3d 363 (6th Cir. 2006); and *U.S. v. Ware*, 63 Fed. Appx. 863 (6th Cir. 2003).

The *Wilson* and *Perez* cases merely discussed the GPS issue as one of the facts of the case, and the courts' holdings did not address the matter in any detail beyond the factual introduction. *Wilson*, 2006 WL 1618148 at \*1; *Perez*, 440 F.3d at 366. Furthermore, each of the cited cases involved situations where the GPS device was placed in the defendant's personal vehicle rather than a rental car. As such, *Wilson* and *Perez* can be distinguished from the one at bar as falling closer to situations where judicial authorization is required, such as placing a wiretap on a suspect's personal phone. Lastly, this court does not find *Ware* applicable here, as that case involved opening a package and inserting a tracking device, and Defendants do not cite any authority indicating that such a situation is analogous to this case. 63 Fed. Appx. at 865.

Defendants also posit that a statutory provision, 18 U.S.C. § 3117, and Proposed

Rule 41(b)(4) of the Federal Rules of Criminal Procedure[6] support the argument that a warrant is required to install a GPS device. Presuming that Proposed Rule 41(b)(4) even governs a situation that occurred more than eight months before the rule is set to take effect, the Court is not persuaded that these provisions are applicable here. Each gives magistrate judges the ability to issue warrants for tracking devices that will be moved outside of their particular judicial district, but neither mentions whether a warrant is required in such a case.

### F. Consent

As a further alternative ground for validating the search of Defendants' vehicle, the government argues that Arlee consented to Tuer's request to search the vehicle. Arlee replies that he had no authority to consent, given that he had not rented the vehicle. Video of the stop also indicates that Tuer only asked to search the trunk, so Arlee asserts that even if he gave consent, the scope of the consent did not extend to a search of the entire car. In any event, further discussion on the issue of consent is irrelevant once Tuer could legally search the vehicle without a warrant as part of a valid *Terry* stop, as discussed above.

### G. The Audio Recording of Defendants' Conversation in Tuer's Patrol Car did not Violate Title III of the Omnibus Crime Control and Safe Streets Act of 1968

Defendant Arlee claims that the conversation between himself and Defendant Holloway that was recorded by the patrol car's in-dash video camera while they were seated in the back of Tuer's car violated Title III of the Omnibus Crime Control and Safe

---

[6]Effective December 1, 2006, absent contrary Congressional action.

Streets Act of 1968, 18 U.S.C. §§ 2510-2522.  Arlee notes that there is an exception to the Act for law enforcement officers who are engaged in the ordinary course of duties, but claims that Tuer's regular duties do not include taping conversations taking place within the patrol car.  Arlee cites no authority to support the assertion that this situation is covered by the Act as cited, however.  The only case brought to this Court's attention involved interception of phone calls from prisoners, something which is clearly a different situation from the one at issue here.  Furthermore, a review of the Act reveals that a person must "intentionally intercept . . . any wire, oral or electronic communication" in order to violate the statute. 18 U.S.C. § 2511(1)(a).  Defendants have produced no evidence that the video camera was placed in Tuer's patrol car with the intention of recording conversations of those in the vehicle rather than to monitor the events of traffic stops.  Without additional support for the assertion that the Act applies under this scenario, Defendant's claim on this point has no merit.

## IV. CONCLUSION

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Defendant Charles Holloway's motion to suppress evidence and Hiawatha Arlee's motion to suppress evidence are DENIED.

SO ORDERED.


                          s/Nancy G. Edmunds
                          Nancy G. Edmunds
                          United States District Judge

Dated: October 16, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 16, 2006, by electronic and/or ordinary mail.

                          s/Carol A. Hemeyer
                          Case Manager